J. W. JOHNSON ET AL. *v.* ALABAMA & VICKSBURG
RAILWAY COMPANY.

1. RAILROADS. *Live stock. Refusal to lay out car. Negligence.*

Where cattle transported in a car with hogs are found to be suffering, the conductor cannot refuse the shipper's request to lay out the car at a station, merely upon the ground that the stock-pen there is unsafe for hogs, it not appearing that the cattle could not be separately unloaded, or that the company was under no duty to make the stock-pen secure.

2. COMMON CARRIERS. *Special contract. Negligence.*

A common carrier is liable for injuries to freight caused by its negligence, notwithstanding, by a special contract with the shipper, it has stipulated against liability except for injuries caused by its fraud or gross negligence.

3. SAME. *Exemption. Burden of proof.*

The burden of proof is upon a common carrier, claiming exemption from liability for injuries to goods under a special contract, to show that the damage resulted from one or more of the excepted causes in the contract, and without its fault. *R. R. Co.* v. *Abels,* 60 Miss., 1017.

FROM the circuit court of the first district of Hinds county.
HON. J. B. CHRISMAN, Judge.

The appellants, J. W. & J. F. Johnson, shipped a mixed car-load of cattle and hogs from Morton to Jackson, Miss. Both places are on the A. & V. Railway, the distance between them being thirty-five miles. The contract of affreightment was the ordinary stock contract, which, in consideration of reduced rates, and of through transportation to the shipper or his agent, stipulated in favor of the railway company that it should be exempt from liability for all damages incident to railroad transportation not caused by its own fraud or gross negligence. It further stipulated that the business of the company should not be delayed by the detention of trains to unload or reload stock for any cause whatever; but cars might be left at a station, upon request of the

person in charge of the same, to be forwarded by the next freight-train, provided the condition of the stock required that they be fed and rested. It further provided that in case of delays the shipper should feed and care for his stock at his own expense.

The car contained thirty-five head of cattle and forty hogs, and there was some conflicting evidence as to whether the car was overloaded.

The train was delayed along the route, and when it reached Brandon, twelve miles from Jackson, the cattle were found to be suffering, and several of them were down. The agent of the shipper, who was on the train accompanying the car, thereupon appealed to the conductor to allow the car to be switched and laid out, but the conductor refused, giving as his reason that the stock-pen there would not confine the hogs, and saying that he would soon make the run to Jackson, and the stock could then be unloaded. Before reaching Jackson there was another delay of an hour or more, and considerable switching of the car at a flag-station, so that the train arrived at Jackson after being about five hours on the road. There was a further delay of about two hours after the train reached the station before the car containing the stock was switched off to the cattle-pen and the opportunity given to unload. Meantime the train did much switching, made necessary by the presence in the switch-yard of other freight-trains, and the fact that the passenger-train, expected to arrive about that time, had the right of way of the track. There was evidence tending to show that this switching was attended with violent shocks to the cattle. When the car was finally delivered at the stock-pen, several of the cattle were dead, others were injured, and it was found that several of the hogs had escaped.

This action was brought by the shippers, who were also the consignees, to recover for their damage, consequent upon the alleged negligence of the company. On the trial, the court gave for the defendant the following instructions :

" 2. The contract in evidence, though signed several days after the loading of the stock, is the contract made at the time of shipment, and under it the plaintiffs stipulated that the business of the company shall not be delayed by detention of trains to load or unload stock, and if the jury believe from the evidence that after the train arrived at Jackson the stock-car was placed at the stock-pen as soon as it reasonably could be, in view of the incoming of the passenger-train and the switching of the cars of the Illinois Central Railroad, the jury will find for defendant.

" 3. If the jury believe from the evidence that the stock in controversy was shipped by the plaintiffs or their agent, Tennant, from Morton, to be transported to Jackson, upon the contract read in evidence, the consignee of plaintiffs assumed thereby all risk of injury, loss or damage, or depreciation which the animals might suffer in consequence of their being weak, or escaping, or injuring themselves or each other, in consequence of unloading, heat, suffocation, fright or viciousness, and all other damages incidental to railroad transportation, unless such damages shall have been caused by the fraud or gross negligence of defendant, and it devolves upon the plaintiffs to show that such fraud or negligence occasioned the loss and damage."

Verdict and judgment for defendant, and plaintiffs appeal.

*C. M. Williamson,* for appellants.

The second instruction is erroneous. It leaves out of the question any negligence proven to have occurred before the train reached Jackson, and tells the jury that under the contract the company is not liable for delay occasioned by its waiting for another company to switch its cars. The jury might have believed that the stock were injured at the flag-station, or because of the delay along the route, or because of the refusal to unload at Brandon. The jury might have thought it was gross negligence in the company not to have a stock-pen at Brandon that would confine hogs. Notwith-

standing all this, they are told to find for the company if there was no negligence after the train reached Jackson. The instruction virtually announces that plaintiffs had stipulated away all their right to damages if some other business of the company should be delayed a short while. Surely the company was bound to provide all proper facilities for the speedy unloading of live stock, if it became necessary along the route, and also upon reaching their destination.

The third instruction is also erroneous. The burden is on the carrier to show that the injury resulted, without its fault, from some cause excepted by the contract. The carrier must show at least *prima facie* that the injury did not result from its own negligence. *Chicago, etc., R. R. Co.* v. *Abels*, 60 Miss., 1017.

A carrier cannot stipulate for exemption from the consequences of its own negligence. 76 Mo., 514; 52 Ala., 606; 98 Mass., 239; 65 Mo., 629; 68 Ga., 644; 44 *Ib.*, 424; 13 Kan., 510; 30 *Ib.*, 645; 31 Minn., 85.

*Nugent & McWillie*, for appellee.

The whole controversy grows out of the detention in Jackson, or failure to deliver the car earlier. When the car reached Jackson, there were four or five animals down, and the testimony shows that the car was greatly overloaded. The delay of two hours at Jackson was made necessary by the crowded condition of the switch-yards, and the fact that the passenger-train was expected, and the freight-train necessarily had to await its arrival. After it passed, freight-trains of the I. C. Railroad had possession of the tracks, and the car could not possibly be switched off to the cattle-pen. Every thing was done to get the loaded car to the stock-pen as soon as possible. There is no controversy as to this.

The only question in the case, then, is whether the contract of affreightment was one which the law allows a carrier to make with the shipper. This question has been answered affirmatively by many authorities. 98 Mass., 239; 84 N. Y.,

5; 11 Lea, 88; 14 Mich., 489; 83 Mo., 574; 66 Miss., 321; 48 Wis., 405; 66 Ga., 438; Hutchinson on Carriers, § 217 *et seq.*

WOODS, J., delivered the opinion of the court.

The second instruction given for the appellee was erroneous, in that it withdrew from the jury's consideration any right to a recovery that the plaintiffs may have had under their contract of shipment, and under the evidence as to the condition of the cattle at Brandon, and their request to be laid out there for unloading. While it is undisputed that the conductor declined to lay out the car-load of stock at Brandon because the stock-pen at that station would not hold the hogs safely, yet this afforded no adequate excuse for the denial with which plaintiff's request was met. From any thing that appears to the contrary, the conductor might have complied with the request, and have avoided all loss and damage to the shippers. The cattle might have been unloaded into the pen at Brandon, (and they were the suffering animals) and the hogs might have been retained in the car. At any rate, the mere fact that the cattle-pen was not capable of holding hogs securely was not conclusive of the other fact that the condition of the pen at Brandon was such as to justify the conductor's refusal to lay out the car at plaintiffs' request; nor was it conclusive of the assumption necessarily involved, to the effect that the railway company was under no duty of having a pen safe for hogs, as well as for cattle. These questions, which were important, were excluded from the jury by this instruction.

The third instruction given for the appellee is not sound. This instruction put upon the plaintiffs the burden of proving that the fraud or gross negligence of the carrier was the cause of the loss and damage. The instruction permits the railway company to avail itself of the provision in the special contract offered in evidence on the trial, exempting itself from liability for injuries resulting from its negligence. It

will be observed that the instruction declares exemption from liability unless in cases occasioned by the *gross* negligence of the carrier. Whatever *gross* negligence may be, it was error to confine liability to cases arising out of that or fraud only. If the defendant was negligent at Brandon, or at Jackson, or elsewhere, in any particular, it was liable, if the loss was occasioned by such negligence.

The instruction was erroneous, furthermore, in putting the burden of proof upon the plaintiffs in every aspect of the case, even if the damage was caused by the fraud or negligence of the railway company. The true rule is that the burden is on the railway company claiming exemption from liability under a special contract, to prove that the loss or damage resulted from one or more of the excepted causes of the contract, and without fault of the railway's servants. " The carrier, in such case, must show at least *prima facie* that the injury did not result from neglect." *Chicago, etc., R. Co.* v. *Abels*, 60 Miss., 1017. The instruction, as it appears to us, reverses this salutary rule, and puts the burden upon the plaintiffs of showing that, through fault of defendant— its gross negligence or fraud, as the instruction erroneously expresses it—the injury took place.